**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------- X

AXOS FINANCIAL, INC.,

                                    Plaintiff,

                    -against-

148 DUANE LLC, KENT M. SWIG, TIMOTHY
TABOR, AKIKO TABOR, BOARD OF MANAGERS
OF 148 DUANE STREET CONDOMINIUM, NEW
YORK CITY ENVIRONMENTAL CONTROL BOARD
and "JOHN DOE NO. 1" to "JOHN DOE NO. 20,"
inclusive, the last twenty names being fictitious and
unknown to plaintiff, the persons or parties intended
being the tenants, occupants, persons or corporations, if
any, having or claiming an interest in or lien upon the
premises described in the complaint,

                                    Defendants.

------------------------------------------------------------------- X

:   Case No. 1:22-cv-251

:   **COMPLAINT**

Plaintiff Axos Financial, Inc. (the "Plaintiff"), by its attorneys Sheppard, Mullin, Richter

& Hampton, LLP, for its Complaint, alleges as follows:

**INTRODUCTION**

1.       This is a complaint to foreclose on three condominium units (Block 146, Lots 1401,

1402, and 1403) with related improvements, personal property and fixtures therein (collectively,

the "Mortgaged Property") at the condominium known as 148 Duane Street Condominium, located

at 148 Duane Street, New York, New York 10013, which is security for (i) a mortgage loan in the

original maximum principal amount of $8,200,000, plus interest and fees, (ii) a construction loan

in the original maximum principal amount of $9,100,000, plus interest and fees, and (iii) a project

loan in the original maximum principal amount of $6,200,000, plus interest and fees, which loans

are evidenced by certain notes, mortgages and other Loan Documents (as defined herein).  The

Loans (as defined herein) were obtained by Defendant 148 Duane LLC (the "Borrower") and

guaranteed by Defendant Kent M. Swig (the "Guarantor"). Borrower has defaulted under the Loan Documents, the defaults have not been cured, and Plaintiff is therefore entitled to immediate repayment of the Loan pursuant to the Loan Documents. Accordingly, Plaintiff is seeking to foreclose on the Mortgaged Property. The Complaint seeks a judgment in the full amount of the Loans (inclusive of all accrued interest and other fees and attorneys' fees and costs), a judgment of foreclosure and sale to foreclose upon and sell the Mortgaged Property to pay off the Loans, a judgment against Borrower for any deficiency amount associated with the Loans, a judgment against Guarantor for any deficiency amount associated with the Loans, and the appointment of a receiver.

## PARTIES

2.      Plaintiff is incorporated in the State of Delaware and has its principal place of business at 9205 West Russell Road, Suite 400, Las Vegas, Nevada 89148, and is thereby a citizen of Nevada and Delaware for purposes of jurisdiction.

3.      Upon information and belief, Borrower, the fee owner of the Mortgaged Property, is a limited liability company organized under the laws of New York with a registered office at Business Filings Incorporated, 187 Wolf Road, Suite 101, Albany, New York, New York 12205. Upon information and belief, Borrower's members are: (i) SE Duane Mezzanine, LLC, a New York limited liability company organized under the laws of New York whose sole member is Guarantor, a citizen of New York domiciled in New York, New York; (ii) SE Duane Management LLC, a New York limited liability company organized under the laws of New York whose sole member is Guarantor; and (iii) SE Duane Capital LLC, a New York limited liability company organized under the laws of New York whose members are: (a) Guarantor; (b) Ronald Shaver, a citizen of Connecticut domiciled in Stamford, Connecticut; (c) LARK Duane, LLC, whose

members are: Arkadi Katselnik, a citizen of New York domiciled in New York, New York; Rita Katselnik, a citizen of New York domiciled in New York, New York; and Leonard Katselnik, a citizen of New York domiciled in New York, New York; and (d) the Melvin M. Swig Trust #1, which is administered by Steven Swig, as Trustee, an individual citizen of California who is domiciled in San Francisco, California, thereby rendering the Melvin M. Swig Trust #1 a citizen of California.   Therefore, Borrower is a citizen of New York, Connecticut, and California for purposes of jurisdiction.

4.      Upon information and belief, Guarantor, an individual, is a citizen of New York for purposes of jurisdiction and is domiciled in New York, New York.

5.      Upon information and belief, defendant Timothy Tabor, an individual, is a citizen of New York for purposes of jurisdiction and is domiciled in New York, New York.   Timothy Tabor is named as a defendant in this action because he has an interest in or lien upon the Mortgaged Property on account of a Judgment entered in the Supreme Court of the State of New York, County of New York, on November 15, 2021 in the action captioned as *Timothy Tabor et al. v. 148 Duane LLC*, Index No. 156655/2018 (the "Tabor Judgment"), which interest is subordinate and junior to Plaintiff's interest.

6.      Upon information and belief, defendant Akiko Tabor (together with Timothy Tabor, the "Tabors"), an individual, is a citizen of New York for purposes of jurisdiction and is domiciled in New York, New York.   Akiko Tabor is named to this action because she has an interest in or lien upon the Mortgaged Property on account of the Tabor Judgment, which interest is subordinate and junior to Plaintiff's interest.

7.      Upon information and belief, defendant Board of Managers of 148 Duane Street Condominium (the "Condo Board") is a condominium community established under Article 9-B

of the Real Property Law of the State of New York and has its principal place of business at 148 Duane Street, New York, New York 10013, and is therefore a citizen of New York for purposes of jurisdiction. The Condo Board is named as a defendant in this action to the extent it has an interest or lien in connection with the Mortgaged Property pursuant to unpaid common charges that is subordinate and junior to Plaintiff's interest.

8. Upon information and belief, defendant New York City Environmental Control Board has a principal place of business at 66 John St #10, New York, NY 10038, and is therefore a citizen of New York for purposes of jurisdiction. The New York City Environmental Control Board is named as a defendant in this action as it may have an interest or lien in connection with the Mortgaged Property on account of not less than eleven unpaid violations docketed on: (1) June, 2017 as Violation No. 0194639702; (2) June, 2017 as Violation No. 0193020989; (3) September, 2017 as Violation No. 0195170351; (4) September, 2017 as Violation No. 0195170434; (5) December, 2017 as Violation No. 011625144X; (6) March, 2018 as Violation No. 0197142038; (7) August, 2019 as Violation No. 0206521810; (8) August, 2019 as Violation No. 0206520308; (9) December, 2019 as Violation No. 0206789963; (10) May, 2021 as Violation No. 0211587669; and (11) October, 2021 as Violation No. 047139011P (collectively, the "Environmental Violations"). The Environmental Violations are interests or liens that, to the extent they are interests or liens on the Mortgaged Property, are subordinate and junior to Plaintiff's interest.

9. Defendants John Doe Nos. "l through 20" inclusive, the names being fictitious as their true names are unknown to Plaintiff, the persons intended as defendants being those who may be in possession are unknown to Plaintiff, the persons intended as defendants being those who may be in possession of, or may have a possessory lien or other interest in, the Mortgaged Property are made defendants because they, or some of them, may have or may claim to have, an interest in the

Mortgaged Property or part thereof, which interest, if any, is subsequent, junior and/or subordinate to the lien being foreclosed by the Mortgaged Property.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1332 as the parties have complete diversity of citizenship and the amount in controversy exceeds the jurisdictional minimum of $75,000, exclusive of interest and costs.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## FACTUAL BACKGROUND

**A.     The Senior Loan Documents**

12.     On or about May 23, 2018, GLEA OSC II, LLC and NINETEEN77 GLEA III, LLC (f/k/a O'CONNOR GLEA III LLC) (together, "GLEA") assigned to BofI Federal Bank (n/k/a Axos Bank) ("Axos Bank"),[1] an affiliate of Plaintiff, a certain Mortgage and Security Agreement made by Borrower to GLEA, as identified and evidenced by that certain *Assignment of Mortgage*, dated May 23, 2018 (the "GLEA Assignment"), which was executed and delivered by GLEA in favor of Axos Bank, and recorded in the New York City Office of the City Register (the "City Register's Office") on May 30, 2018, City Register File No. 2018000179017.  Annexed hereto as Exhibit 1 is a true and correct copy of the GLEA Assignment.

13.     On or about May 23, 2018, Borrower obtained a mortgage loan from Axos Bank in the original maximum principal amount of $8,200,000 (the "Senior Loan").  The Senior Loan is evidenced by the following documentation in favor of Axos Bank and executed by Borrower: (i) that certain *Amended, Restated, Consolidated and Reaffirmed Promissory Note* dated May 23,

---

[1] Effective October 1, 2018, BofI Federal Bank changed its name to Axos Bank.

2018 (the "Senior Loan Note"); and (ii) that certain *Loan Agreement* dated May 23, 2018 (as may have been amended from time to time, the "Senior Loan Agreement").  Annexed hereto as Exhibits 2, and 3, respectively, are true and correct copies of the Senior Loan Note and the Senior Loan Agreement.

14.    The Senior Loan Note provides for repayment of the Senior Loan in accordance with the following payment schedule: monthly interest payments at an interest rate floor of 7.00%, which rate shall adjust on the first day of each calendar month during the term of the Senior Loan, made on the first day of each month beginning on June 1, 2018.  *See* Senior Loan Note §§ 1, 2(a). The Senior Loan Note also provides that the entire principal balance of the Senior Loan, plus all accrued interest, fees and other outstanding amounts thereon, shall be due and payable on May 22, 2020, which date could be extended in accordance with the terms of the Senior Loan Agreement (the "Original Senior Loan Maturity Date").  *See id.* at § 2(b)(i).

15.    Further, pursuant to the Senior Loan Note, upon the occurrence and during the continuance of an Event of Default (as defined in the Senior Loan Agreement), all amounts outstanding under the Senior Loan Note, the Senior Loan Agreement, and the other Senior Loan Documents (as defined herein) shall bear interest until paid in full at a per annum rate equal to the lesser of (a) the maximum rate of interest allowed by applicable law or (b) thirteen percent (13%) per annum (the "Senior Loan Default Rate").  *See id* at § 1.

16.    The obligations under the Senior Loan Note were secured by a mortgage for value received, as evidenced by that certain *Amended, Restated, Consolidated and Reaffirmed Mortgage, Assignment of Rents, Security Agreement and Fixture Filing* dated May 23, 2018 (the "Senior Loan Mortgage"), executed by Borrower in favor of Axos Bank.  Pursuant to the Senior Loan Mortgage, all prior mortgages, which constituted the mortgage and security agreement identified in the GLEA

-6-

Assignment, were duly consolidated into one joint lien and first mortgage in the original maximum principal amount of $8,200,000. The Senior Loan Mortgage was recorded in the City Register's Office on May 30, 2018, City Register File No. 2018000179018. Annexed hereto as <u>Exhibit 4</u> is a true and correct copy of the Senior Loan Mortgage.

17.     Further, pursuant to the Senior Loan Mortgage, Borrower granted Axos Bank a security interest in and to the Mortgaged Property, which is designated as collateral under the Senior Loan Documents and has the following legal description:

> The Condominium Units (the "Units") known Penthouse in the building (the "Building") known as the 148 Duane Street Condominium and by the street number 148 Duane Street, Borough of Manhattan, County of New York, City and State of New York, said Units being designated and described in a certain declaration dated as of January 23, 2014 made by Summit 148 Duane LLC pursuant to Article 9-B of the Real Property, Law of the State of New York (the "Condominium Act"), establishing a plan for condominium ownership of the Building and the land (the "Land") upon which the Building is situate which Land is more particularly described below, which declaration was recorded in the Office of the Register of The City of New York, County of New York (the "City Register's Office") on March 18, 2014 as CRFN 2014000092553, as amended by First Amendment to Declaration dated as of January 8, 2015, and recorded January 28, 2015 as CRFN 2015000031351 (the "Declaration"). The Units are also designated as Tax Lots 1401, 1402, 1403 in Block 146 of the Borough of Manhattan on the Tax Map of the Real Property Assessment Department of the City of New York and on the Floor Plans of said Building, certified by Arpad Baksa, Registered Architect, and filed with the Real Property Assessment Department of The City of New York on March 13, 2014, as Condominium Plan No. 2400, and also filed in the City Register's Office on March 18, 2014, as Map No. as CRFN 2014000092554.
>
> Together with, an undivided 19.38% (as to Commercial), 51.72% (as to Multifloor) and 28.90% (as to Penthouse) interest in the common elements.
>
> The land on which the building lies is described as follows:

All that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the southerly side of Duane Street, distant 42 feet 4-3/4 inches (actual) (42 feet 4 inches declaration of condominium) easterly from the corner formed by the intersection of the easterly line or side of West Broadway and the southerly line or side of Duane Street which said point being the center of a party wall;

RUNNING THENCE easterly and along the southerly line or side of Duane Street, 33 feet 10- 1/4 inches to the center of a party wall;

THENCE southerly part of the distance through the center of a party wall,  116 feet 6 inches to a point;

THENCE westerly and on a line parallel to Duane Street or nearly so, 33 feet 8 inches to a point; and

THENCE northerly and part of the distance through the center of a party wall 116 feet 6 inches to the southerly line or side of Duane Street the point or place of BEGINNING.

NOTE: Being Block(s) 146, Lot(s) 1401, 1402, 1403, Tax Map of the Borough of New York, County of New York.

18.    Moreover, pursuant to the Senior Loan Mortgage, Borrower promised to pay all

taxes, assessments, levies and charges that may be imposed on the Mortgaged Property by any

public authority which are, or may become, liens upon the Mortgaged Property prior to any

applicable delinquency.  *See* Senior Loan Mortgage at § 6.2.  Borrower further agreed to pay or

cause to be paid when due all obligations secured by or reducible to liens and encumbrances which

shall now or hereafter encumber the Mortgaged Property whether senior or subordinate hereto.

*See id.* at § 6.4.

19.    Additionally, pursuant to the terms of the Senior Loan Mortgage, as security for the

payment of the Senior Loan, Borrower granted Axos Bank a security interest in all Personal

Property and Fixtures (as such terms are defined in the Senior Loan Mortgage), wherever situated,

in which Borrower has any interest, together with all replacements and proceeds of and additions and accessions thereto, and all books, records and files relating to the Personal Property and Fixtures. *See id.* at § 4.1. Axos Bank's security interest on this Personal Property and Fixtures was recorded in the City Register's Office on May 30, 2018, City Register File No. 2018000179021 (the "Senior Loan UCC-1 Statement"). Annexed hereto as Exhibit 5 is a true and correct copy of the Senior Loan UCC-1 Statement.

20.    On April 25, 2024, Axos Bank timely filed a UCC-3 Continuation Statement in the City Register's Office, City Register File No. 2023000101592 (the "Senior Loan UCC-3 Continuation Statement"), thereby extending the validity and effectiveness of the Senior Loan UCC-1 Statement through May 30, 2028. Annexed hereto as Exhibit 6 is a true and correct copy of the Senior Loan UCC-3 Continuation Statement.

**B.    The Construction Loan Documents**

21.    On or about May 23, 2018, Borrower obtained a construction loan from Axos Bank in the original maximum principal amount of $9,100,000 (the "Construction Loan"). The Construction Loan is evidenced by the following documentation in favor of Axos Bank and executed by Borrower: (i) that certain *Construction Loan Promissory Note* dated May 23, 2018 (the "Construction Loan Note"); and (ii) that certain *Construction Loan Agreement* dated May 23, 2018 (as may have been amended from time to time, the "Construction Loan Agreement"). Annexed hereto as Exhibits 7, and 8, respectively, are true and correct copies of the Construction Loan Note and the Construction Loan Agreement.

22.    The Construction Loan Note provides for repayment of the Construction Loan in accordance with the following payment schedule: monthly interest payments at an interest rate floor of 7.00%, which rate shall adjust on the first day of each calendar month during the term of

the Construction Loan, made on the first day of each month beginning on June 1, 2018. *See* Construction Loan Note §§ 1, 2(a). The Construction Loan Note also provides that the entire principal balance of the Construction Loan, plus all accrued interest, fees and any outstanding amounts thereon, shall be due and payable on May 22, 2020, which date could be extended in accordance with the terms of the Construction Loan Agreement (the "Original Construction Loan Maturity Date"). *See id.* at § 2(b)(i).

23.    Further, pursuant to the Construction Loan Note, upon the occurrence and during the continuance of an Event of Default (as defined in the Construction Loan Agreement), all amounts outstanding under the Construction Loan Note, the Construction Loan Agreement, and the other Construction Loan Documents (as defined herein) shall bear interest until paid in full at a per annum rate equal to the lesser of (a) the maximum rate of interest allowed by applicable law or (b) thirteen percent (13%) per annum (the "Construction Loan Default Rate"). *See id.* at § 1.

24.    The obligations under the Construction Loan Note were secured by a mortgage for value received, as evidenced by that certain *Construction Mortgage, Assignment of Rents, Security Agreement and Fixture Filing* dated May 23, 2018 (the "Construction Loan Mortgage"), executed by Borrower in favor of Axos Bank. The Construction Loan Mortgage was recorded in the City Register's Office on May 30, 2018, City Register File No. 2018000179019. Annexed hereto as Exhibit 9 is a true and correct copy of the Construction Loan Mortgage.

25.    Pursuant to the Construction Loan Mortgage, Borrower granted Axos Bank a security interest in the Mortgaged Property.

26.    Further, pursuant to the Construction Loan Mortgage, Borrower promised to pay all taxes, assessments, levies and charges that may be imposed on the Mortgaged Property by any public authority which are, or may become, liens upon the Mortgaged Property prior to any

applicable delinquency. *See* Construction Loan Mortgage at § 6.2. Borrower further agreed to pay or cause to be paid when due all obligations secured by or reducible to liens and encumbrances which shall now or hereafter encumber the Mortgaged Property whether senior or subordinate hereto. *See id.* at § 6.4.

27.    Additionally, pursuant to the terms of the Construction Loan Mortgage, as security for the payment of the Construction Loan, Borrower granted Axos Bank a security interest in all Personal Property and Fixtures (as such terms are defined in the Construction Loan Mortgage), wherever situated, in which Borrower has any interest, together with all replacements and proceeds of and additions and accessions thereto, and all books, records and files relating to the Personal Property and Fixtures. *See id.* at § 4.1. Axos Bank's lien on this Personal Property and Fixtures was recorded in the City Register's Office on May 30, 2018, City Register File No. 2018000179022 (the "Construction Loan UCC-1 Statement"). Annexed hereto as Exhibit 10 is a true and correct copy of the Construction Loan UCC-1 Statement.

28.    On April 25, 2024, Axos Bank timely filed a UCC-3 Continuation Statement in the City Register's Office, City Register File No. 2023000101575 (the "Construction Loan UCC-3 Continuation Statement"), thereby extending the validity and effectiveness of the Construction Loan UCC-1 Statement through May 30, 2028. Annexed hereto as Exhibit 11 is a true and correct copy of the Construction Loan UCC-3 Continuation Statement.

C.    **The Project Loan Documents**

29.    On or about May 23, 2018, Borrower obtained a project loan from Axos Bank in the original maximum principal amount of $6,200,000 (the "Project Loan" and, together with the Senior Loan and the Construction Loan, the "Loans"). The Project Loan is evidenced by the following documentation in favor of Axos Bank and executed by Borrower: (i) that certain *Project*

*Loan Promissory Note* dated May 23, 2018 (the "Project Loan Note" and, together with the Senior Loan Note and Construction Loan Note, the "Notes"); and (ii) that certain *Project Loan Agreement* dated May 23, 2018 (as may have been amended from time to time, the "Project Loan Agreement" and, together with the Senior Loan Agreement and Construction Loan Agreement, the "Loan Agreements").  Annexed hereto as Exhibits 12, and 13, respectively, are true and correct copies of the Project Loan Note and the Project Loan Agreement.

30.     The Project Loan Note provides for repayment of the Project Loan in accordance with the following payment schedule: monthly interest payments at an interest rate floor of 7.00%, which rate shall adjust on the first day of each calendar month during the term of the Project Loan, made on the first day of each month beginning on June 1, 2018.  *See* Project Loan Note §§ 1, 2(a). The Project Loan Note also provides that the entire principal balance of the Project Loan, plus accrued interest and fees thereon, shall be due and payable on May 22, 2020, which date could be extended in accordance with the terms of the Project Loan Agreement (the "Original Project Loan Maturity Date").  *See id.* at § 2(b)(i).

31.     Further, pursuant to the Project Loan Note, upon the occurrence and during the continuance of an Event of Default (as defined in the Project Loan Agreement), all amounts outstanding under the Project Loan Note, the Project Loan Agreement, and the other Project Loan Documents (as defined herein) shall bear interest until paid in full at a per annum rate equal to the lesser of (a) the maximum rate of interest allowed by applicable law or (b) thirteen percent (13%) per annum (the "Project Loan Default Rate" and, together with the Senior Loan Default Rate and the Construction Loan Default Rate, the "Default Rate").  *See id.* at § 1.

32.     The obligations under the Project Loan Note were secured by a mortgage for value received, as evidenced by that certain *Project Loan Mortgage, Assignment of Rents, Security*

-12-

*Agreement and Fixture Filing* dated May 23, 2018 (the "<u>Project Loan Mortgage</u>" and, together with the Senior Loan Mortgage and the Construction Loan Mortgage, the "<u>Mortgages</u>"), executed on May 23, 2018 by Borrower in favor of Axos Bank.  The Project Loan Mortgage was recorded in the City Register's Office on May 30, 2018, City Register File No. 2018000179020.  Annexed hereto as <u>Exhibit 14</u> is a true and correct copy of the Project Loan Mortgage.

33.    Pursuant to the Project Loan Mortgage, Borrower granted Axos Bank a security interest in the Mortgaged Property.

34.    Further, pursuant to the Project Loan Mortgage, Borrower promised to pay all taxes, assessments, levies and charges that may be imposed on the Mortgaged Property by any public authority which are, or may become, liens upon the Mortgaged Property prior to any applicable delinquency.  *See* Project Loan Mortgage at § 6.2.  Borrower further agreed to pay or cause to be paid when due all obligations secured by or reducible to liens and encumbrances which shall now or hereafter encumber the Mortgaged Property whether senior or subordinate hereto.  *See id.* at § 6.4.

35.    Additionally, pursuant to the terms of the Project Loan Mortgage, as security for the payment of the Project Loan, Borrower granted Axos Bank a security interest in all Personal Property and Fixtures (as such terms are defined in the Project Loan Mortgage), wherever situated, in which Borrower has any interest, together with all replacements and proceeds of and additions and accessions thereto, and all books, records and files relating to the Personal Property and Fixtures.  *See id.* at § 4.1.  Plaintiff's lien on this Personal Property and Fixtures was recorded in the City Register's Office on May 30, 2018, City Register File No. 2018000179023 (the "<u>Project Loan UCC-1 Statement</u>").  Annexed hereto as <u>Exhibit 15</u> is a true and correct copy of the Project Loan UCC-1 Statement.

36.    On April 25, 2024, Axos Bank timely filed a UCC-3 Continuation Statement in the City Register's Office, City Register File No. 2023000101591 (the "Project Loan UCC-3 Continuation Statement"), thereby extending the validity and effectiveness of the Project Loan UCC-1 Statement through May 30, 2028.  Annexed hereto as Exhibit 16 is a true and correct copy of the Project Loan UCC-3 Continuation Statement.

**D.    The Performance Guaranty and the Non-Recourse Guaranty**

37.    On May 23, 2018, Guarantor executed that certain *Performance and Completion Guaranty* (the "Performance Guaranty").  Pursuant to the Performance Guaranty, Guarantor agreed, among other things, to absolutely, unconditionally and irrevocably guarantee the full, complete and punctual performance by Borrower of all of its obligations, duties, covenants and agreements under the Construction Loan Documents and the Project Loan Documents with respect to the completion of the redevelopment and the construction project related to the condominium known as the 148 Duane Street Condominium (the "Construction Project") free and clear of any claim for mechanic's, materialman's or any other liens, and the full and prompt payment of any costs and expenses incurred in connection with enforcement of the Construction Loan and the Project Loan.  *See* Performance Guaranty at §§ 1(a), (b).  Annexed hereto as Exhibit 17 is a true and correct copy of the Performance Guaranty.

38.    On May 23, 2018, Guarantor executed that certain *Non-Recourse Guaranty*, dated May 23, 2018 (the "Non-Recourse Guaranty" and together with the Performance Guaranty, the "Guaranties").  Pursuant to the Non-Recourse Guaranty, Guarantor absolutely, unconditionally, and irrevocably guaranteed the full and prompt payment of all amounts payable by Borrower to Axos Bank under the Loan Documents, which liability was limited pursuant to the terms and

conditions set forth in the Non-Recourse Guaranty.  Annexed hereto as <u>Exhibit 18</u> is a true and correct copy of the Non-Recourse Guaranty.

39.    Specifically, under the Non-Recourse Guaranty, Axos Bank was granted full and unlimited recourse against Guarantor for the entire amount of the indebtedness of the Loans if the Mortgaged Property was encumbered in violation of any of the restrictions on encumbrance contained in the Loan Documents, including, without limitation, the Tabor Judgment.  *See* Non-Recourse Guaranty § 3.1.4.

40.    Moreover, pursuant to the Non-Recourse Guaranty, notwithstanding the recourse limitations set forth in the Non-Recourse Guaranty, Guarantor was required to hold harmless, defend, and indemnify Axos Bank from and against, and Axos Bank was granted recourse against Guarantor for, any actual losses, damages costs, expenses, and liabilities arising out of or in any way related to Borrower's failure to pay judgments that could create liens on any portion of the Mortgaged Property, including, without limitation, the Tabor Judgment.  *See* id. at § 3.2.2

41.    Similarly, pursuant to the Non-Recourse Guaranty, notwithstanding the recourse limitations set forth in the Non-Recourse Guaranty, Guarantor was required to hold harmless, defend, and indemnify Axos Bank from and against, and Axos Bank was granted recourse against Guarantor for, any actual losses, damages costs, expenses, and liabilities arising out of or in any way related to the Mortgaged Property suffering material physical waste.  *See id.* at § 3.2.7.

42.    In addition to all other amounts due to Axos Bank under the Non-Recourse Guaranty, Guarantor was obligated to pay Enforcement Costs (as defined in the Non-Recourse Guaranty) to Axos Bank, upon demand, if any of the following occurs: (a) the Non-Recourse Guaranty is placed in the hands of an attorney for collection or is collected through any legal proceeding; (b) an attorney is retained to represent Axos Bank in any bankruptcy, reorganization,

receivership, or other proceedings affecting creditors' rights and involving a claim under the Non-Recourse Guaranty; (c) an attorney is retained to provide advice or other representation with respect to the Non-Recourse Guaranty; or (d) an attorney is retained to represent Axos Bank in any proceedings whatsoever in connection with the Non-Recourse Guaranty, and Axos Bank prevails in any such proceedings. The recourse limitations provided in the Non-Recourse Guaranty shall not apply to Enforcement Costs, and Guarantor shall be obligated to pay any and all Enforcement Costs incurred by Axos Bank.  *See id.* at § 15.

**E.    Extensions of the Original Maturity Date**

43.    Pursuant to the Senior Loan Agreement, Borrower could elect to extend the Original Senior Loan Maturity Date for two (2) periods of six (6) months by giving written notice to Axos Bank of its election to do so not less than thirty days (30) days prior to the then-applicable Senior Loan Maturity Date.  *See* Senior Loan Agreement § 2.5.  Following Borrower's election, Axos Bank's obligation to extend the then-applicable Senior Loan Maturity Date was subject to Borrower's satisfaction of certain conditions described in the Senior Loan Agreement, with such satisfaction determined by Axos Bank in its sole discretion.  *See id.*

44.    On May 23, 2020, in accordance with Section 2.5 of the Senior Loan Agreement, Axos Bank, Borrower, and Guarantor entered into that certain *First Amendment to Loan Documents (Senior Loan)* (the "First Senior Loan Amendment") wherein, *inter alia*, the Original Senior Loan Maturity Date was extended to November 23, 2020 (the "First Extended Senior Loan Maturity Date").  Annexed hereto as Exhibit 19 is a true and correct copy of the First Senior Loan Amendment.

45.    On May 21, 2021, in accordance with Section 2.5 of the Senior Loan Agreement Axos Bank, Borrower and Guarantor entered into that certain *Second Amendment to Loan*

*Documents (Senior Loan)* (the "Second Senior Loan Amendment" and, together with the Senior Loan Note, Senior Loan Agreement, Senior Loan Mortgage, Senior Loan UCC-1 Statement, Senior Loan UCC-3 Continuation Statement, and First Senior Loan Amendment, the "Senior Loan Documents") effective as of November 23, 2020, and wherein, *inter alia*, the First Extended Senior Loan Maturity Date was extended to April 30, 2022 (the "Second Extended Senior Loan Maturity Date"), and the Senior Loan Default Rate was increased to be equal to the lesser of (a) the maximum rate of interest allowed by applicable law, or (b) fifteen percent (15%) per annum. Annexed hereto as Exhibit 20 is a true and correct copy of the Second Senior Loan Amendment.

46.    Pursuant to the Construction Loan Agreement, Borrower could elect to extend the Original Construction Loan Maturity Date for two (2) periods of six (6) months by giving written notice to Plaintiff of its election to do so not less than thirty days (30) days prior to the then-applicable Construction Loan Maturity Date. *See* Construction Loan Agreement § 2.5. Following Borrower's election, Axos Bank's obligation to extend the then-applicable Construction Loan Maturity Date was subject to Borrower's satisfaction of certain conditions described in the Construction Loan Agreement, with such satisfaction determined by Axos Bank in its sole discretion. *See id.*

47.    On May 23, 2020, in accordance with Section 2.5 of the Construction Loan Agreement, Axos Bank, Borrower, and Guarantor entered into that certain *First Amendment to Loan Documents (Construction Loan)*, dated May 23, 2020 (the "First Construction Loan Amendment") wherein, *inter alia*, the Original Construction Loan Maturity Date was extended to November 23, 2020 (the "First Extended Construction Loan Maturity Date"). Annexed hereto as Exhibit 21 is a true and correct copy of the First Construction Loan Amendment.

48.    On May 21, 2021, in accordance with Section 2.5 of the Construction Loan Agreement, Plaintiff, Borrower, and Guarantor entered into that certain *Second Amendment to Construction Loan Agreement and Loan Documents*, dated May 21, 2021 (the "Second Construction Loan Amendment" and, together with the Construction Loan Note, Construction Loan Agreement, Construction Loan Mortgage, Construction Loan UCC-1 Statement, Construction Loan UCC-3 Continuation Statement and First Construction Loan Amendment, the "Construction Loan Documents") effective as of November 23, 2020, and wherein, *inter alia*, the First Extended Construction Loan Maturity Date was extended to April 30, 2022 (the "Second Extended Construction Loan Maturity Date"), and the Construction Loan Default Rate was increased to be equal to the lesser of (a) the maximum rate of interest allowed by applicable law, or (b) fifteen percent (15%) per annum.  Annexed hereto as Exhibit 22 is a true and correct copy of the Second Construction Loan Amendment.

49.    Pursuant to the Project Loan Agreement, Borrower could elect to extend the Original Project Loan Maturity Date for two (2) periods of six (6) months by giving written notice to Axos Bank of its election to do so not less than thirty days (30) days prior to the then-applicable Project Loan Maturity Date.  *See* Project Loan Agreement § 2.5.  Following Borrower's election, Axos Bank's obligation to extend the then-applicable Project Loan Maturity Date was subject to Borrower's satisfaction of certain conditions described in the Project Loan Agreement, with such satisfaction determined by Axos Bank in its sole discretion.  *See id.*

50.    On May 23, 2020, in accordance with Section 2.5 of the Project Loan Agreement, Axos Bank, Borrower, and Guarantor entered into that certain *First Amendment to Loan Documents (Project Loan)*, dated May 23, 2020 (the "First Project Loan Amendment") wherein, *inter alia*, the Original Project Loan Maturity Date was extended to November 23, 2020 (the "First

Extended Project Loan Maturity Date"). Annexed hereto as <u>Exhibit 23</u> is a true and correct copy of the First Project Loan Amendment.

51.     On May 21, 2021, in accordance with Section 2.5 of the Project Loan Agreement, Axos Bank, Borrower, and Guarantor entered into that certain *Second Amendment to Loan Documents (Project Loan)*, dated May 21, 2021 (the "<u>Second Project Loan Amendment</u>" and, together with the Project Loan Note, Project Loan Agreement, Project Loan Mortgage, Project Loan UCC-1 Statement, Project Loan UCC-3 Continuation Statement and First Project Loan Amendment, the "<u>Project Loan Documents</u>" and, together with the Senior Loan Documents and Construction Loan Documents, the "<u>Loan Documents</u>") effective as of November 23, 2020, and wherein, *inter alia*, the First Extended Project Loan Maturity Date was extended to April 30, 2022 (the "<u>Second Extended Project Loan Maturity Date</u>" and, together with the Second Extended Senior Loan Maturity Date and the Second Extended Construction Loan Maturity Date, the "<u>Second Extended Maturity Date</u>"), and the Project Loan Default Rate was increased to be equal to the lesser of (a) the maximum rate of interest allowed by applicable law, or (b) fifteen percent (15%) per annum. Annexed hereto as <u>Exhibit 24</u> is a true and correct copy of the Second Project Loan Amendment.

## F.     Forbearance Agreement

52.     On July 15, 2022, Borrower, Guarantor, and Axos Bank entered into that certain *Forbearance Agreement* (the "<u>Forbearance Agreement</u>"). Pursuant to the Forbearance Agreement, *inter alia*, Axos Bank, in consideration of the representations, covenants and agreements made by Borrower in the Forbearance Agreement, agreed to forbear from exercising its rights and remedies under the Loan Documents on account of the expiration of the Second Extended Maturity Date, along with other defaults under the Loan Documents, until the earlier of October 1, 2022 or the

date of any default under the Forbearance Agreement (the "Forbearance Period"). Annexed hereto as Exhibit 25 is a true and correct copy of the Forbearance Agreement.

53.     Moreover, under the Forbearance Agreement, Borrower acknowledged and confirmed the occurrence of certain Events of Default (as defined in the Forbearance Agreement), including: (i) Borrower's failure to repay the indebtedness under the Loans on the Second Extended Maturity Date; (ii) that a judgment was filed against Borrower in an amount equal to $197,633.30—*i.e.,* the Tabor Judgment—which judgment constitutes a lien, and which Tabor Judgment was issued as part of an order and judgment entered on November 15, 2021; (iii) Borrower's failure to complete the Construction Project on or before April 30, 2022; and (iv) Borrower's failure to keep the Construction Loan and Project Loan "In Balance" in accordance with the terms and provisions of the Construction Loan Agreement and the Project Loan Agreement.

54.     Additionally, pursuant to the Forbearance Agreement, Borrower acknowledged and agreed that Axos Bank was entitled to charge interest on the outstanding principal balance of the Loans at the Default Rate from and after the Second Extended Maturity Date.

## G.     **The Defaults and the Default Notices**

55.     Borrower defaulted under the Loan Documents by failing to pay Axos Bank the indebtedness under the Loans by the Second Extended Maturity Date, which was acknowledged by Borrower as an event of default in the Forbearance Agreement (the "Maturity Date Default").

56.     Further, pursuant to the Loan Agreements, any default under any document or instrument, other than the Loan Documents, evidencing, creating or otherwise giving rise to a lien on the Mortgaged Property or any portion thereof shall constitute an event of default under the

Loans.  *See* Senior Loan Agreement § 8.6; Construction Loan Agreement § 9.6; Project Loan Agreement § 9.6.

57.    Accordingly, Borrower defaulted under the Loan Documents as a result of the lien on the Mortgaged Property that arose in connection with the Tabor Judgment filed against the Borrower, which was acknowledged by Borrower as an event of default in the Forbearance Agreement (the "Judgment Lien Default").

58.    Pursuant to the Construction Loan Agreement and the Project Loan Agreement, the Construction Loan and the Project Loan must at all times remain "In Balance."  *See* Construction Loan Agreement § 8.10.1; Project Loan Agreement § 8.10.1.

59.    Borrower defaulted under the Construction Loan Agreement and the Project Loan Agreement by failing to pay any monetary amount due under the Loan Documents, including monetary amounts necessary to keep the Construction Loan and the Project Loan "In Balance," within the applicable time period provided in the Loan Documents, which was acknowledged by Borrower as an event of default in the Forbearance Agreement (the "Loan Balancing Default"). *See* Construction Loan Agreement § 9.1; Project Loan Agreement § 9.1.

60.    Moreover, pursuant to the Second Construction Loan Amendment and the Second Project Loan Amendment, Borrower covenanted that it would substantially complete the Construction Project on or before April 30, 2022.  *See* Second Construction Loan Amendment § 2.3; Second Project Loan Amendment § 2.3.

61.    Borrower defaulted under the Construction Loan Agreement and the Project Loan Agreement by failing to complete the Construction Project on or before April 30, 2022, which was acknowledged by Borrower as an event of default in the Forbearance Agreement (the "Construction Completion Default" and, together with the Maturity Date Default, the Judgment

Lien Default and the Loan Balancing Default, the "Defaults").  *See* Construction Loan Agreement § 9.4; Project Loan Agreement § 9.4.

62.    On November 15, 2024, Axos Bank sent a notice (the "Senior Loan Default Notice") to Borrower, with a copy to Guarantor, stating, *inter alia*, that (i) Borrower was in default under the Senior Loan Documents due to the failure to satisfy the outstanding balance of the Senior Loan prior to or upon the expiration of the Second Extended Senior Loan Maturity Date, (ii) as of November 15, 2024, the outstanding balance due under the Senior Loan Documents was $11,683,144.14, inclusive of accrued interest and exclusive of attorneys' fees and expenses, and (iii) if Axos Bank did not immediately receive payment in full for the outstanding balance of the Senior Loan, then Axos Bank may exercise its rights and remedies under the Senior Loan Documents without further notice and demand to Borrower.  Annexed hereto as Exhibit 26 is a true and correct copy of the Senior Loan Default Notice.

63.    Also, on November 15, 2024, Axos Bank sent a notice (the "Construction Loan Default Notice") to Borrower, with a copy to Guarantor, stating, *inter alia*, that (i) Borrower was in default under the Construction Loan Documents due to the failure to satisfy the outstanding balance of the Construction Loan prior to or upon the expiration of the Second Extended Construction Loan Maturity Date, (ii) as of November 15, 2024, the outstanding balance due under the Construction Loan Documents was $8,911,476.32, inclusive of accrued interest and exclusive of attorneys' fees and expenses, and (iii) if Axos Bank did not immediately receive payment in full for the outstanding balance of the Construction Loan, then Axos Bank may exercise its rights and remedies under the Construction Loan Documents without further notice and demand to Borrower.  Annexed hereto as Exhibit 27 is a true and correct copy of the Construction Loan Default Notice.

64.     Additionally, on November 15, 2024, Axos Bank sent a notice (the "Project Loan Default Notice" and, together with the Senior Loan Default Notice and Construction Loan Default Notice, the "Default Notices") to Borrower, with a copy to Guarantor stating, *inter alia*, that (i) Borrower was in default under the Project Loan Documents due to the failure to satisfy the outstanding balance of the Project Loan prior to or upon the expiration of the Second Extended Project Loan Maturity Date, (ii) as of November 15, 2024, the outstanding balance due under the Project Loan Documents was $3,201,585.11, inclusive of accrued interest and exclusive of attorneys' fees and expenses, and (iii) if Axos Bank did not immediately receive payment in full for the outstanding balance of the Project Loan, then Axos Bank may exercise its rights and remedies under the Project Loan Documents without further notice and demand to Borrower. Annexed hereto as Exhibit 28 is a true and correct copy of the Project Loan Default Notice.

65.     Despite the Default Notices delivered to Borrower, as well as to Guarantor, the indebtedness under the Loans remains unpaid and Borrower remains in default under the Loan Documents.

66.     As a result of the Defaults, the indebtedness under the Loans is accruing interest at the Default Rate beginning on the Second Extended Maturity Date and continuing until the Loans, together with interest and other associated fees and costs (including attorneys' fees and expenses) accruing under the Loan Documents, are paid in full.

67.     As of December 31, 2024, in connection with the Senior Loan, Borrower owes principal, accrued interest and loan advances of $11,788,660.25, excluding attorneys' fees and expenses.

68.     As of December 31, 2024, in connection with the Construction Loan, Borrower owes principal and accrued interest of $8,898,200.30, excluding attorneys' fees and expenses.

69.     As of December 31, 2024, in connection with the Project Loan, Borrower owes principal and accrued interest of $3,243,651.14, excluding attorneys' fees and expenses.

**H.     <u>Assignment to Plaintiff</u>**

70.     On or about December 27, 2024, Axos Bank assigned to Plaintiff all of its right, title, and interest in and to the Loans and the Loan Documents, identified and evidenced by, among other things, (i) that certain *Assignment of Mortgage (Senior Loan)*, dated December 26, 2024 and recorded by Plaintiff on December 30, 2024 in the City Register's Office, City Register File No. 2024000338586, (ii) that certain *Assignment of Mortgage (Construction Loan)*, dated December 26, 2024 and recorded by Plaintiff on December 30, 2024 in the City Register's Office, City Register File No. 2024000338588, and (iii) that certain *Assignment of Mortgage (Project Loan)*, dated December 26, 2024 and recorded by Plaintiff on December 30, 2024 in the City Register's Office, City Register File No. 2024000338587 (collectively, the "<u>Axos Assignments</u>").  Annexed hereto as <u>Exhibit 29</u> are true and correct copies of the Axos Assignments.

71.     In connection with the Axos Assignments, on December 30, 2024, Plaintiff filed (i) a UCC-3 Amendment in the City Register's Office, City Register File No. 2024000338589 (the "<u>Senior Loan UCC-3 Amendment</u>"), (ii) a UCC-3 Amendment in the City Register's Office, City Register File No. 2024000338591 (the "<u>Construction Loan UCC-3 Amendment</u>"), and (iii) a UCC-3 Amendment in the City Register's Office, City Register File No. 2024000338590 (the "<u>Project Loan UCC-3 Amendment</u>" and, together with the Senior Loan UCC-3 Amendment and the Construction Loan UCC-3 Amendment, the "<u>UCC-3 Amendments</u>").  Annexed hereto as <u>Exhibit 30</u> are true and correct copies of the UCC-3 Amendments.

## I.    <u>Plaintiff's Remedies Under the Loan Documents</u>

72.    Pursuant to the Loan Agreements, while an event of default such as the Defaults described herein exists, Plaintiff may exercise all rights and remedies under the Loan Documents, at law or in equity. *See* Senior Loan Agreement § 9.2; Construction Loan Agreement § 10.2; Project Loan Agreement § 10.2.

73.    Further, pursuant to the express terms of the Mortgages, upon the occurrence of an event of default such as the Defaults described herein and at any time thereafter, Plaintiff may, without limitation, commence a foreclosure action against the Mortgaged Property.  *See* Senior Loan Mortgage § 7.2 (c); Construction Loan Mortgage § 7.2 (c); Project Loan Mortgage § 7.2 (c).

74.    Moreover, pursuant to the Mortgages, Borrower agreed to pay Plaintiff immediately upon demand the full amount of all payments, advances, charges, out-of-pocket costs and expenses, including reasonable attorneys' fees and expenses expended or incurred by Plaintiff in enforcing its rights and remedies under the Loan Documents. *See* Senior Loan Mortgage § 7.6; Construction Loan Mortgage § 7.6; Project Loan Mortgage § 7.6.

75.    Additionally, pursuant to the Construction Loan Agreement and the Project Loan Agreement, following an Event of Default (as defined therein), Plaintiff may apply for a receiver to take possession of the Mortgaged Property, complete the Construction Project, and/or do anything Plaintiff reasonably determines is necessary or appropriate to fulfill the Borrower's obligations under the Construction Loan Documents and/or the Project Loan Documents.  *See* Construction Loan Agreement § 10.5.1*;* Project Loan Agreement § 10.5.1.

76.    Moreover, pursuant to the Mortgages, upon the occurrence of any default thereunder, Plaintiff shall have the right to apply to a court of competent jurisdiction for and obtain the appointment of a receiver of the Mortgaged Property as a matter of strict right and without

regard to: (i) the adequacy of the security for the repayment of the obligations secured by the Mortgages; (ii) the existence of a declaration that the obligations secured by the Mortgages are immediately due and payable; or (iii) the filing of a notice of default, and Borrower consents to such appointment. *See* Senior Loan Mortgage § 7.2(d); Construction Loan Mortgage § 7.2(d); Project Loan Mortgage § 7.2(d).

77.    Plaintiff shall not be deemed to have waived, altered, released or changed any of its rights and remedies made by virtue of the commencement of this action by reason of payment after the date of commencement of this action of any or all of the Defaults mentioned herein, and such election shall continue and remain effective until the principal sum secured and the costs and disbursements of this action and any and all future defaults under the Loan Documents occurring prior to a discontinuance of this action are fully paid.

78.    In order to protect its security, Plaintiff may be compelled during the pendency of this action to pay sums for premiums on insurance policies, real estate taxes, assessments, water charges and sewer rents which are or may become liens on the Mortgaged Property, as well as other charges which may be necessary for the protection of the Mortgaged Property.  Plaintiff prays that any sum or sums so paid, together with interest from the date of payments, shall be added to Plaintiff's claim and be deemed secured by said Loan Documents and adjudged a valid lien on the mortgaged premises, and that Plaintiff be paid such sums, together with interest thereon, out of the proceeds of the sale of the mortgaged premises.

79.    Upon information and belief, the Mortgaged Property may be subject to any state of facts that an accurate survey may show and a physical inspection would disclose, zoning regulations or ordinances, rights of holders of security instruments in fixtures as defined by the New York Uniform Commercial Code, orders, requirements or violations of such orders or

requirements issued by a governmental body having jurisdiction against or affecting the Mortgaged Property, and existing tenancies or occupancies.

80.    Plaintiff is the sole, true and lawful owner and holder of the Notes, the Mortgages, and the other Loan Documents, and is in possession of the Notes.

81.    No other actions have been brought to recover any part of the debt arising out of the Loan Documents.

**J.    Other Liens**

82.    Timothy Tabor is made a defendant hereto in the original principal sum of $197,633.30, with a judgment lien recorded in the New York County Clerk's Office, State of New York (the "Clerk's Office") on November 15, 2021, Control Nos. 04052800 01 & 004052800 02. Timothy Tabor's alleged interest or lien in the Mortgaged Property is subordinate and junior to Plaintiff's interest.

83.    Akiko Tabor is made a defendant hereto in the original principal sum of $197,633.30, with a judgment lien recorded in the Clerk's Office on November 15, 2021, Control Nos. 04052800 01 & 004052800 02. Akiko Tabor's alleged interest or lien in the Mortgaged Property is subordinate and junior to Plaintiff's interest.

84.    The Condo Board is made a defendant hereto to the extent it has liens accruing for unpaid common charges associated with the Mortgaged Property. The Condo Board's alleged interests or liens associated with the Mortgaged Property are subordinate and junior to Plaintiff's interest.

85.    The New York City Environmental Control Board is made a defendant hereto to the extent it has a lien associated with the Mortgaged Property. The New York City Environmental

Control Board's alleged interest or lien associated with the Mortgaged Property is subordinate and junior to Plaintiff's interest.

## COUNTS

## Count I (Foreclosure of Mortgaged Property as to All Defendants)

86.     Plaintiff incorporates paragraphs 1 through 85 as though fully stated herein.

87.     The following encumbrances of record are subsequent and junior in right to the Mortgages on the Mortgaged Property herein being foreclosed:

a.      Timothy Tabor, as a junior creditor, against Borrower in the amount of $197,633.30, with a judgment lien recorded in the Clerk's Office on November 15, 2021 as Control Nos. 04052800 01 & 004052800 02.

b.      Akiko Tabor, as a junior creditor, against Borrower in the amount of $197,633.30, with a judgment lien recorded in the Clerk's Office on November 15, 2021 as Control Nos. 04052800 01 & 004052800 02.

c.      The Condo Board, as a junior creditor, to the extent it has liens accruing for unpaid common charges associated with the Mortgaged Property.

d.      The Environmental Control Board of the City of New York, as a junior creditor, to the extent is has a lien associated with the Mortgaged Property.

88.     The rights of any tenants or any person claiming any right of occupancy in the Mortgaged Property are subsequent in right to the Mortgages.

89.     Plaintiff, simultaneously herewith, gives notice to Borrower and all named defendants of the pendency of this action.

90.     Plaintiff is the sole, true and lawful owner and holder of the Notes, the Mortgages, and the other Loan Documents.

91.     Borrower failed to satisfy the outstanding balance of the Loans, including principal, interest, and/or other sums due under the Loan Documents by the Second Extended Maturity Date in default of the Loan Documents.

92.     Additionally, Borrower defaulted under some or all of the Loan Documents as a result of (i) the Tabor Judgment filed against the Borrower, which judgment constitutes a junior lien upon the Mortgaged Property, (ii) Borrower's failure to complete the Construction Project on or before April 30, 2022, and (iii) Borrower's failure to keep the Construction Loan and Project Loan "In Balance" in accordance with the terms and provisions of the Construction Loan Agreement and the Project Loan Agreement.

93.     As a result of Borrower's Defaults, all outstanding amounts under the Notes, the Loan Agreements, and the other Loan Documents bear interest at the Default Rate from the Second Extended Maturity Date until paid in full.

94.     Further, as the result of Borrower's Defaults, Plaintiff is contractually entitled to exercise its remedies under the Loan Documents including, but not limited to, foreclosure of the Mortgaged Property.

95.     Upon information and belief, the Mortgaged Property does not constitute a "vacant and abandoned residential property" as such term is defined pursuant to section 1309 of the Real Property Actions and Proceedings Law ("RPAPL") because it is an unoccupied building that is undergoing construction, renovation, or rehabilitation.

96.     Plaintiff also gives notice that it has complied, or promptly will comply, with the provisions of sections 1303, 1305 and 1320 of the RPAPL to the extent applicable.

97.    No other actions has been brought to recover any part of the debt arising out of the Loan Documents.

**Count II (Deficiency Judgment Against Borrower)**

98.    Plaintiff incorporates paragraphs 1 through 97 as though fully stated herein.

99.    Plaintiff is the sole, true and lawful owner and holder of the Notes, the Mortgages, and the other Loan Documents.

100.    Borrower is in default of its obligations to Plaintiff by reason of, *inter alia*, its failure to fully pay the outstanding principal, interest, and/or other sums due under the Loan Documents by the Second Extended Maturity Date.

101.    Borrower's failure to pay such indebtedness in full by the Second Extended Maturity Date constitutes a breach of the Notes and the other Loan Documents.

102.    Additionally, Borrower defaulted under some or all of the Loan Documents as a result of (i) the Tabor Judgment filed against the Borrower, which judgment constitutes a junior lien upon the Mortgaged Property, (ii) Borrower's failure to complete the Construction Project on or before April 30, 2022, and (iii) Borrower's failure to keep the Construction Loan and Project Loan "In Balance" in accordance with the terms and provisions of the Construction Loan Agreement and the Project Loan Agreement.

103.    As a result of Borrower's breach and defaults of the Notes and the other Loan Documents, all outstanding amounts under the Notes, the Loan Agreements, and the other Loan Documents bear interest at the Default Rate from the Second Extended Maturity Date until paid in full.

104.    By operation of the expiration of the Second Extended Maturity Date, the entire outstanding balance of the Loans is due and owing as follows:

a.    As of December 31, 2024, in connection with the Senior Loan, Borrower owes principal, accrued interest and loan advances of $11,788,660.25, excluding attorneys' fees and expenses.

b.    As of December 31, 2024, in connection with the Construction Loan, Borrower owes principal and accrued interest of $8,898,200.30, excluding attorneys' fees and expenses.

c.     As of December 31, 2024, in connection with the Project Loan, Borrower owes  principal and accrued interest of $3,243,651.14, excluding attorneys' fees and expenses.

105.    Interest continues to accrue at the Default Rate from the Second Extended Maturity Date pursuant to terms of the Notes.  Further, Plaintiff has incurred, and will continue to incur, attorneys' fees, costs and other expenses for which Borrower is liable under the Loan Documents.

106.    Pursuant to the Loan Agreements, while an event of default such as the Defaults exists, Plaintiff may exercise all rights and remedies at law including, without limitation, all rights to pursue Borrower for a deficiency judgment in accordance with RPAPL § 1371.

**Count III (Suit on the Guaranties Against Guarantor)**

107.    Plaintiff incorporates paragraphs 1 through 106 as though fully stated herein.

108.    Pursuant to the Performance Guaranty, Guarantor agreed to absolutely, unconditionally and irrevocably guarantee the full, complete and punctual performance by Borrower of all of its obligations, duties, covenants and agreements under the Construction Loan Documents and the Project Loan Documents with respect to the Construction Project free and clear of any claim for mechanic's, materialman's or any other liens, and the full and prompt payment of

any costs and expenses incurred in connection with enforcement of the Construction Loan and the Project Loan.

109.    The occurrence of the Loan Balancing Default and the Construction Completion Default unconditionally and irrevocably triggered Guarantor's obligations under the Performance Guaranty.

110.    Further, pursuant to the Non-Recourse Guaranty, Plaintiff has full and unlimited recourse against Guarantor for the entire amount of the indebtedness of the Loans if the Mortgaged Property was encumbered in violation of any of the restrictions on encumbrance contained in the Loan Documents including, without limitation, the Tabor Judgment. *See* Non-Recourse Guaranty § 3.1.4.

111.    Accordingly, the encumbrance of the Mortgaged Property as a result of the Tabor Judgment results in Plaintiff having full and unlimited recourse against Guarantor for the entire amount of the indebtedness of the Loans.

112.    Moreover, pursuant to the Non-Recourse Guaranty, notwithstanding the recourse limitations set forth in the Non-Recourse Guaranty, Guarantor is required to hold harmless, defend, and indemnify Plaintiff from and against, and Plaintiff shall have recourse against Guarantor for, any actual losses, damages costs, expenses, and liabilities arising out of or in any way related to Borrower's failure to pay judgments that can create liens on any portion of the Mortgaged Property including, without limitation, the Tabor Judgment. *See id.* at § 3.2.2.

113.    Accordingly, Guarantor is required to hold harmless, defend, and indemnify Plaintiff from and against, and Plaintiff shall have recourse against Guarantor for, any actual losses, damages costs, expenses, and liabilities arising out of or in any way related to Borrower's failure to pay the Tabor Judgment that created a lien on the Mortgaged Property.

114.    Further, pursuant to the Non-Recourse Guaranty, notwithstanding the recourse limitations set forth in the Non-Recourse Guaranty, Guarantor was required to hold harmless, defend, and indemnify Plaintiff from and against, and Plaintiff shall have recourse against Guarantor for, any actual losses, damages costs, expenses, and liabilities arising out of or in any way related to the Mortgaged Property suffering material physical waste. *See id.* at § 3.2.7.

115.    Accordingly, Guarantor is required to hold harmless, defend, and indemnify Plaintiff from and against, and Plaintiff shall have recourse against Guarantor for, any actual losses, damages costs, expenses, and liabilities arising out of or in any way related to the Mortgaged Property suffering material physical waste.

116.    In addition to all other amounts due to Plaintiff under the Non-Recourse Guaranty, Guarantor was obligated to pay Enforcement Costs (as defined in the Non-Recourse Guaranty) to Plaintiff upon demand if any of the following occurs: (a) the Non-Recourse Guaranty is placed in the hands of an attorney for collection or is collected through any legal proceeding; (b) an attorney is retained to represent Plaintiff in any bankruptcy, reorganization, receivership, or other proceedings affecting creditors' rights and involving a claim under the Non-Recourse Guaranty; (c) an attorney is retained to provide advice or other representation with respect to the Non-Recourse Guaranty; or (d) an attorney is retained to represent Plaintiff in any proceedings whatsoever in connection with the Non-Recourse Guaranty and Plaintiff prevails in any such proceedings. The limitations on recourse provided in the Non-Recourse Guaranty shall not apply to Enforcement Costs, and Guarantor shall be obligated to pay any and all Enforcement Costs incurred by Plaintiff. *See id.* at § 15.

117.    Accordingly, Guarantor is obligated, without limitation, to pay Enforcement Costs (as defined in the Non-Recourse Guaranty) to Plaintiff in connection with Plaintiff's enforcement of its rights and remedies under the Non-Recourse Guaranty and the related Loan Documents.

118.    Despite service of the Default Notices on Guarantor, Guarantor did not respond to the Default Notices, nor did he pay the amounts owed to Plaintiff.

119.    Guarantor should be adjudged liable to Plaintiff pursuant to the terms of the Guaranties for any and all relevant indebtedness of Borrower under the Loan Documents.

**Count IV (Appointment of a Receiver)**

120.    Plaintiff incorporates paragraphs 1 through 119 as though fully stated herein.

121.    Borrower failed to satisfy the outstanding balance of the Loans, including principal, interest, and/or other sums due under the Loan Documents by the Second Extended Maturity Date in default of the Loan Documents.

122.    Additionally, Borrower defaulted under some or all of the Loan Documents as a result of (i) the Tabor Judgment filed against the Borrower, which judgment constitutes a junior lien upon the Mortgaged Property, (ii) Borrower's failure to complete the Construction Project on or before April 30, 2022, and (iii) Borrower's failure to keep the Construction Loan and Project Loan "In Balance" in accordance with the terms and provisions of the Construction Loan Agreement and the Project Loan Agreement.

123.    The Loan Documents expressly allow Plaintiff to seek the appointment of a receiver of the Mortgaged Property following an event of default as a matter of strict right and without regard to: (i) the adequacy of the security for the repayment of the obligations secured by the Mortgages; (ii) the existence of a declaration that the obligations secured by the Mortgages are

immediately due and payable; or (iii) the filing of a notice of default, and Borrower consented to such appointment.

124.    Plaintiff, as an interested and secured party, is threatened with material losses and injuries to the Mortgaged Property and a dissipation or diminution in value of the same if Borrower remain in control of the Mortgaged Property.

125.    Therefore, in accordance with Rule 66 of the Federal Rules of Civil Procedure, Plaintiff, as a secured creditor, asks the Court to appoint a receiver to take immediate possession of and hold, subject to the discretion of this Court, the Mortgaged Property for the benefit of Plaintiff.

WHEREFORE, Plaintiff demands judgment:

(a)    Adjudging damages in the aggregate principal amount of $8,179,267.80 for the Senior Loan; $6,116,332.71 for the Construction Loan; and $2,243,839.58 for the Project Loan, plus accrued interest, protective advances, other outstanding amounts, and attorneys' fees and expenses, due to Plaintiff under the Notes and the Mortgages;

(b)    Barring and forever foreclosing defendants and all persons claiming by, through or under them, subsequent to the commencement of this action, of all estate, right, title, lien, claim or equity of redemption in the Mortgaged Property or to any fixtures, fittings and appliances affixed thereto;

(c)    Selling the Mortgaged Property and all fixtures, fittings and appliances affixed thereto; bringing the proceeds arising from the sale into Court; and paying to Plaintiff from such proceeds (excepting the amounts under any zoning regulations or ordinances of the County of New York, New York or violations of such, rights of holders of security instruments in fixtures as defined by the New York Uniform Commercial Code, orders or requirements or violations of such

orders or requirements issued by a governmental body having jurisdiction against the Mortgaged Property and existing tenancies or occupancies) the principal amount due on the Notes plus accrued interest at the Default Rate, any advances for insurance and real estate property taxes as specified in the Loan Documents, reimbursement for all expenses incurred in obtaining such costs, expenses and disbursements of this action, the expense of sale together with any sums which may have been paid or which may be paid by Plaintiff for taxes, other insurance premiums, water charges, sewer rent and assessments and all surcharges and advances to be paid on the Mortgaged Property, together with interest thereon from the dates of the respective payments and advances until the date of payment;

        (d)    That if the proceeds of the sale are insufficient to pay the amounts due to Plaintiff as set forth herein, the referee conducting the sale shall be required by the judgment of the sale to specify the amount of deficiency in the report of sale so that Plaintiff may make the appropriate application for a deficiency judgment pursuant to Section 1371 of the RPAPL against Borrower;

        (e)    Adjudging Guarantor liable under the Guaranties for the amounts set forth therein;

        (f)    Appointing a receiver of the Mortgaged Property during the pendency of this action to (i) receive and collect the earnings, revenues, rents, issues, profits and income from the Mortgaged Property, and (ii) take the necessary measures to protect, improve, and remediate the Mortgaged Property in order to protect and safeguard the collateral for the Loan; and

        (g)    Awarding Plaintiff such other and further relief as the Court deems just and proper.

Date: January 10, 2025

Respectfully submitted,

**SHEPPARD MULLIN RICHTER & HAMPTON LLP**

By: */s/ Michael T. Driscoll*
Michael T. Driscoll, Esq.
Damani C. Sims, Esq.
Benjamin O. Gilbert, Esq.
30 Rockefeller Plaza
New York, New York 10112
Tel:  (212) 653-8700
Fax: (212) 653-8701
E-mail: mdriscoll@sheppardmullin.com
          dsims@sheppardmullin.com
          bogilbert@sheppardmullin.com

*Counsel for Plaintiff Axos Financial, Inc.*